**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MAIN STREET HOSPITALITY CORP. d/b/a BRASSERIE 292, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ERIE INSURANCE COMPANY and ERIE INSURANCE COMPANY OF NEW YORK,<br><br>Defendants. | Case No.:  1:21-cv-127<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Main Street Hospitality Corp. d/b/a Brasserie 292 ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendants Erie Insurance Company and Erie Insurance Company of New York (collectively, "Defendant") and, upon information and belief, alleges as follows:

**JURISDICTION AND VENUE**

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because (1) this matter exceeds $5,000,000, (2) the action is a class action, (3) there are members of the class diverse from Defendant, and (4) there are more than 100 class members.

2.      This Court has personal jurisdiction over Defendant. Defendant Erie Insurance Company is headquartered in this District, and Defendant has engaged in substantial business in this District, including the formation of the Policy underlying Plaintiff's claims. Defendant has therefore personally availed itself of jurisdiction in this District.

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendant Erie Insurance Company is a resident of this District and a substantial part of the events or

1

omissions giving rise to the claim occurred in this District, including the formation of the Policy underlying Plaintiff's claims.

## PARTIES

4.     At all relevant times, Plaintiff Main Street Hospitality Corp. d/b/a Brasserie 292 is a New York corporation. Plaintiff operates a restaurant in New York located at 294 Main Street, Poughkeepsie, NY 12601 ("Insured Property"). Plaintiff is a resident and citizen of New York.

5.     Defendant Erie Insurance Company is an insurance company with its headquarters and principal place of business in Pennsylvania. Defendant transacts the business of insurance in New York. Defendant is a resident and citizen of Pennsylvania.

6.     Defendant Erie Insurance Company of New York is an insurance company with its headquarters and principal place of business in New York. Defendant transacts the business of insurance in New York. Defendant is a resident and citizen of New York.

## FACTUAL ALLEGATIONS

**I.     Insurance Coverage**

7.     At all relevant times, Defendant issued a policy to Plaintiff to cover business interruption loss from July 15, 2019 until July 15, 2020 and then from July 15, 2020 until July 15, 2021 for its business at the Insured Property. The policy number is 0972130994. This policy was intended to cover losses to business interruption. *See* Policy, attached hereto as Exhibit 1 ("Policy").

8.     The Policy is currently in full effect in providing, among other things, personal property, business income loss and extra expense, civil authority, and other coverage.

9.     Plaintiff submitted a claim for a loss pursuant to its Policy seeking coverage under this Policy. Defendant rejected Plaintiff's claim for coverage for business income loss and extra

expense, civil authority, and other claims, contending, *inter alia*, that there was no physical loss or damage to Plaintiff's Insured Property or surrounding property.

10.     Plaintiff faithfully paid policy premiums to Defendant, specifically to provide, among other things, additional coverages in the event of business income loss and extra expense or business interruption or closures by order of civil authority.

11.     The Policy covers for damages resulting from business interruption when there is property damage, which is standard in most commercial property insurance policies, along with coverage for extra expenses.

12.     The Policy also covers the actual loss of business income sustained and the actual, necessary, and reasonable extra expenses incurred when access to the Insured Property is specifically prohibited by order of civil authority as the direct result of a covered cause of loss to property in the immediate area of Plaintiff's Insured Property. This additional coverage is identified as coverage under "Civil Authority."

13.     The Policy provides that a covered cause of loss, including but not limited to direct physical loss or direct physical damage, triggers coverage unless the loss is specifically excluded or limited in the Policy.

14.     Plaintiff's Policy protects against catastrophic events, such as the one occurring now, involving the global COVID-19 Pandemic that has resulted in the widespread, omnipresent, and persistent presence of COVID-19 in and around Plaintiff's Insured Property, including adjacent properties.

15.     Coverage under the Policy is to be broadly interpreted and provided, and exclusions are to be narrowly construed in favor of coverage.

16.     There is no Virus Exclusion in the Policy, and thus, Plaintiff's claims are covered under the plain language of the Policy.

17.     The language in the Policy is "adhesionary" in that Plaintiff was not a participant in negotiating or drafting its content and provisions.

18.     Plaintiff was not a participant in negotiating or drafting the Policy's content and provisions. Plaintiff possessed no leverage or bargaining power to alter or negotiate the terms of the Policy, and more particularly, Plaintiff had no ability to alter, change or modify standardized language derived from a format developed by the Insurance Services Organization ("ISO").

19.     The presence of virus or disease can constitute physical damage to property, as the insurance industry has recognized since at least 2006. When developing endorsement language to include in policies purportedly to exclude coverage for damages and losses relating to the occurrence of a virus at, on or near a property, the ISO circulated a statement to state insurance regulators that included the following, purportedly to explain the concept of the Virus Exclusion:

> Disease-causing agents may render a product impure (change its quality or substance),or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case.

20.     Plaintiff purchased the Policy with a reasonable expectation that it was purchasing a policy that would provide coverage in the event of a business interruption, such as that suffered by Plaintiff as a result of the COVID-19 Pandemic.

21.     The absence of the Virus Exclusion in Plaintiff's Policy means that the coverage being provided is as broad as possible, as there was no effort, regardless of whether such an effort was valid or not, to narrow the scope of coverage by an addition of a Virus Exclusion Endorsement to Plaintiff's Policy.

22.     Plaintiff's Policy is entitled to the broadest interpretation possible, as the language of the Virus Exclusion shows that the insurance industry recognized that viruses cause property damage and physical loss of use of property, and that the insurance industry, through the adoption of a Virus Exclusion was attempting to protect insurance carriers from having to cover losses and damages associated with a virus.

23.     Defendant did not adopt a Virus Exclusion in its Policy with Plaintiff, and in the absence of such an endorsement, Plaintiff's Policy must be construed to provide coverage where a virus is involved. The explanatory language about the 2006 Virus Exclusion demonstrates that policies without a virus exclusion clearly covered losses and damages associated with the occurrence of a virus, regardless of whether the Virus Exclusion was sufficient or adequate to protect an insurance carrier from a claim for coverage where the Virus Exclusion was included as an endorsement in a policy.

24.     At no time had Defendant or its agents notified Plaintiff that the coverage that Plaintiff had purchased that included business interruption coverage had exclusions and provisions that purportedly undermined the very purpose of the coverage—to provide benefits in the event of a business interruption. Even so, Plaintiff's Policy did not contain a virus exclusion endorsement.

25.     The reasonable expectations of Plaintiff—*i.e.*, an objectively reasonable interpretation by the average Policyholder of the coverage that was being provided—was that the Policy included coverage when a civil authority forced closure of the business for an issue of public

5

safety such as that involving the COVID-19 pandemic in the immediate area surrounding the Insured Property.

26.     The purported exclusions of the Policy that Defendant has or is expected to raise in defense of Plaintiff's claim under the Civil Authority coverage of the Policy are contradictory to the provision of Civil Authority coverage and violate public policy as a contract of adhesion and hence are not enforceable against Plaintiff.

27.     Plaintiff is not seeking coverage because of personal injuries caused by the virus, but rather coverage for property damage, physical loss of use of property, business income loss, and extra expense.

28.     The civil authority orders prohibited access to Plaintiff's Insured Property, and the area immediately surrounding the Insured Property, in response to dangerous physical conditions described above resulting from COVID-19. As a result of the presence of COVID-19 and the civil authority orders, Plaintiff suffered physical loss of use of property, business income loss, and incurred extra expenses.

29.     The Policy does not exclude the losses suffered by Plaintiff, and therefore, the Policy does provide coverage for the losses incurred by Plaintiff.

30.     Based on information and belief, Defendant has accepted the policy premiums with no intention of providing any coverage for property damage, business income loss or extra expense, or Civil Authority orders.

31.     Factual issues related to direct physical loss of use or physical damage to Plaintiff's Insured Property and/or surrounding property will require development of a factual record through discovery. Plaintiff also intends to serve subpoenas on the ISO and Department of Insurance regarding coverage under the Policy's standardized language, including but not limited to

statements made by Defendant and by the ISO on behalf of Defendant as to meanings of language in Policies.

## II.   The Coronavirus Pandemic

32.     The scientific community, and those personally affected by the virus, recognize the Coronavirus as a cause of real physical loss and damage. It is clear that contamination of the Insured Property would be a direct physical loss requiring remediation to clean the surfaces of the business.

33.     The virus that causes COVID-19 remains stable and transmittable in aerosols for up to three hours, up to four hours on copper, up to 24 hours on cardboard and up to two to three days on plastic and stainless steel. *See* https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces (last visited April 9, 2020).

34.     The CDC has issued a guidance that gatherings of more than 10 people must not occur. People in congregate environments, which are places where people live, eat, and sleep in close proximity, face increased danger of contracting COVID-19.

35.     On March 11, 2020 the World Health Organization ("WHO") made the assessment that        COVID-19        shall        be        characterized        as        a        pandemic.        *See* https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

36.     The global Coronavirus pandemic is exacerbated by the fact that the deadly virus physically infects and stays on surfaces of objects or materials, "fomites," for up to twenty-eight (28) days. Human coronaviruses can remain infectious on inanimate surfaces at room temperature for up to 9 days. At a temperature of 30 degrees Celsius (86 degrees F) or more the duration of persistence is shorter. *See* https://www.ncbi.nim.nih.gov/pmc/articles/PMC7132493/ (last visited July 16, 2020).

37.     A particular challenge with the novel coronavirus is that it is possible for a person to be infected with COVID-19 but be asymptomatic. Thus, seemingly healthy people unknowingly spread the virus via speaking, breathing, and touching objects.

38.     While infected droplets and particles carrying COVID-19 may not be visible to the naked eye, they are physical objects which travel to other objects and cause harm. Habitable surfaces on which COVID-19 has been shown to survive include, but are not limited to, stainless steel, plastic, wood, paper, glass, ceramic, cardboard, and cloth.

39.     The virus is thought to spread mainly from person to person: between people who are in close contact with one another (within about 6 feet); through respiratory droplets produced when an infected person coughs, sneezes or talks; these droplets can land in the mouths or noses of people who are nearby or possibly be inhaled into the lungs; and some recent studies have suggested that COVID-19 may be spread by people who are not showing symptoms. *See* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

40.     The CDC has noted that "[i]t may be possible that a person can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose, or possibly their eyes, but this is not thought to be the main way the virus spreads." *See* https://www.cdc.gov/foodsafety/newsletter/food-safety-and-Coronavirus.html.

41.     The CDC has said that the best way to prevent illness is to avoid being exposed to this virus and that steps can be taken to slow its spread: Maintain good social distance (about 6 feet). This is very important in preventing the spread of COVID-19; Wash your hands often with soap and water. If soap and water are not available, use a hand sanitizer that contains at least 60% alcohol; Routinely clean and disinfect frequently touched surfaces; and Cover your mouth and nose with a cloth face covering when around others.

8

42.     "The primary and most important mode of transmission for COVID-19 is through close contact from person-to-person. Based on data from lab studies on COVID-19 and what we know about similar respiratory diseases, it may be possible that a person can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose, or possibly their eyes, but this isn't thought to be the main way the virus spreads." https://www.cdc.gov/media/releases/2020/s0522-cdc-updates-covid-transmission.html          (last edited May 23, 2020).

43.     A number of studies have demonstrated that the coronavirus is "much more resilient to cleaning than other respiratory viruses so tested." *See* Nevio Cimolai, *Environmental and decontamination issues for human coronaviruses and their potential surrogates*, 92 J. Med. Virol. 2498 (2020), https://doi.org/10.1002/jmv.26170.

44.     The measures that must be taken to remove the coronavirus from property are significant and far beyond ordinary or routine cleaning.

45.     The mere fact that the coronavirus is known to be on property demonstrates it as impacting physical property, rendering property unsafe pending appropriate, thorough and constant cleaning in an effort to remove the coronavirus from property with which it comes into contact.

46.     Efficacy of decontaminating agents for viruses is based on a number of factors, including the initial amount of virus present, contact time with the decontaminating agent, dilution, temperature, and pH, among many others. Detergent surfactants are not recommended as single agents, but rather in conjunction with complex disinfectant solutions. *Id.* Additionally, it can be challenging to accurately determine the efficacy of decontaminating agents. The toxicity of an

agent may inhibit the growth of cells used to determine the presence of virus, making it difficult to determine if lower levels of infectious virus are actually still present on treated surfaces. *Id.*

47.     In order to be effective, cleaning and decontamination procedures require strict adherence to protocols not necessarily tested under "real life" or practical conditions, where treated surfaces or objects may not undergo even exposure or adequate contact time. *Id.*

48.     Studies of coronaviruses have demonstrated viral RNA persistence on objects despite cleaning with 70% alcohol. *See* Joon Young Song et al., *Viral Shedding* and *Environmental Cleaning in Middle East Respiratory Syndrome Coronavirus Infection*, 47 J. Infection & Chemotherapy 252 (Dec. 2015), https://doi.org/10.3947/ic.2015.47.4.252.

49.     Studies have demonstrated that a virus can survive on fabrics and be transferred to skin and other surfaces, "suggesting it is biologically plausible that . . . infectious diseases can be transmitted directly through contact with contaminated textiles." Lucy Owen and Katie Laird, *The role of textiles as fomites in the healthcare environment: a review of the infection control risk*, 8 PeerJ e9790 (2020), https://peerj.com/articles/9790/.

50.     This demonstrates that the coronavirus and COVID-19, and the measures required to prevent their spread from surfaces and materials used by the Plaintiff, cause physical loss of or damage to property.

51.     Moreover, the aerosolized coronavirus particles and virions cannot be eliminated by routine cleaning. Cleaning surfaces in an indoor space will not remove the aerosolized coronavirus particles from the air that people can inhale and become infected with the coronavirus and develop COVID-19. Mike Ives & Apoorva Mandavilli, *The Coronavirus Is Airborne Indoors. Why Are We Still Scrubbing Surfaces?*, N.Y. Times (Nov. 18, 2020), https://www.nytimes.com/2020/11/18/world/asia/covid-cleaning.html.

52.     Given the ubiquity and pervasiveness of the coronavirus, no amount of cleaning or ventilation intervention will prevent a person infected with the coronavirus from entering an indoor space and exhaling millions of coronavirus particles and virions into the air, further: (a) filling the air with the aerosolized coronavirus that can be inhaled, sometimes with deadly consequences; and (b) depositing coronavirus particles and virions on the surfaces, physically altering and transforming those surfaces into disease-transmitting fomites.

53.     Cleaning of property at a given moment does not assure that the property will not again be impacted by the coronavirus. Much like testing provides essentially only a snapshot in time about whether a person had the coronavirus at the time of the test, but nothing about whether the person contracted COVID-19 after the test was performed, cleaning only sanitizes property (if performed correctly) at any given moment in time until the cleaning "wears off." This therefore requires businesses to constantly engage in cleaning efforts at cost in order to comply with CDC recommendations.

54.     Compliance with the CDC recommendations, along with compliance with the civil authority orders, effectively made it impossible for Plaintiff to operate its business in the usual and customary manner causing the business to suffer business losses and added expenses as provided for and covered under the Policy.

55.     China, Italy, France, and Spain have implemented the cleaning and fumigating of public areas prior to allowing them to re-open publicly due to the intrusion of microbials.

56.     A French Court has determined that business interruption coverage applies to the COVID-19                                    Pandemic.                                 *See* https://www.insurancejournal.com/news/international/2020/05/22/569710.htm.

57.     Similarly, on September 15, 2020, the United Kingdom's High Court found that the 'disease' and/or 'denial of access' clauses in the various insurance policy wordings provide coverage in the circumstances of the COVID-19 pandemic, and that the trigger for coverage caused policyholders' losses. The High Court further noted:

> The fact that a provision in a contract is expressed as an exception does not necessarily mean that it should be approached with a pre-disposition to construe it narrowly. Like any other provision in a contract, words of exception or exemption must be read in the context of the contract as a whole and with due regard for its purpose. As a matter of general principle, it is well established that that if one party, otherwise liable, wishes to exclude or limit his liability to the other party, he must do so in clear words; and that the contract should be given the meaning it would convey to a reasonable person having all the background knowledge which is reasonably available to the person or class of persons to whom the document is addressed.

https://www.fca.org.uk/publication/corporate/bi-insurance-test-case-judgment.pdf.

58.     Courts in other countries, including Australia and South Africa, have also ruled in favor of policyholders in similar cases. *See* https://www.cliffordchance.com/briefings/2020/11/covid-19--landmark-judgments-in-nsw--australia--and-england-in-b.html; https://www.insurancejournal.com/news/international/2020/12/17/594368.htm.

59.     These cases are consistent with public policy that during a worldwide pandemic, such as COVID-19, businesses that possess business interruption insurance coverage should recover their losses from the insurance carriers.

**III.    Civil Authority**

60.     On March 7, 2020, New York Governor Andrew Cuomo declared a Disaster Emergency for the entire state of New York as a result of COVID-19.

61.     On March 12, 2020, Governor Cuomo set restrictions on large gatherings.

62.     On March 20, 2020, the State of New York issued a stay-at-home order that all non-essential workers must stay at home as a result of the COVID-19 pandemic. This order was subsequently extended to May 15, 2020, and has been extended several times thereafter.

63.     On April 17, 2020, the State of New York ordered all individuals over the age of two to wear a face covering when in a public place.

64.     The Orders were issued due to the presence of the coronavirus throughout the state, including causing physical loss and damage to property in and around Plaintiff's Insured Property.

65.     Further, on April 10, 2020, then President Trump seemed to support insurance coverage for business loss like that suffered by the Plaintiff.

> REPORTER: Mr. President may I ask you about credit and debt as well. Many American individuals, families, have had to tap their credit cards during this period of time. And businesses have had to draw down their credit lines. Are you concerned Mr. President that that may hobble the U.S. economy, all of that debt number one? And number two, would you suggest to credit card companies to reduce their fees during this time?
>
> PRESIDENT TRUMP: Well it's something that we've already suggested, we're talking to them. Business interruption insurance, I'd like to see these insurance companies—you know you have people that have paid. ***When I was in private I had business interruption.*** When my business was interrupted through a hurricane or whatever it may be, I'd have business where I had it, I didn't always have it, sometimes I had it, sometimes, I had a lot of different companies. But if I had it I'd expect to be paid. You have people. I speak mostly to the restaurateurs, where they have a restaurant, they've been paying for 25, 30, 35 years, business interruption. They've never needed it. All of a sudden they need it. And I'm very good at reading language. I did very well in these subjects, OK. And I don't see the word pandemic mentioned. Now in some cases it is, it's an exclusion. But in a lot of cases I don't see it. I don't see it referenced. And they don't want to pay up. I would like to see the insurance companies pay if they need to pay, if it's fair. And they know what's fair, and I know what's fair, I can tell you very quickly. But business interruption insurance, that's getting a lot money to a lot of people. And they've been paying for years, sometimes they just started paying, ***but you have people that have never asked for business interruption insurance, and they've been***

13

> *paying a lot of money for a lot of years for the privilege of having*
> *it, and then when they finally need it, the insurance company says*
> *'we're not going to give it.' We can't let that happen*.

*See* https://youtu.be/_cMeG5C9TjU (last visited on April 17, 2020).

66.    The former President was articulating a few core points:

    a.   Business interruption is a common type of insurance.

    b.   Businesses pay in premiums for this coverage and should reasonably expect
they'll receive the benefit of the coverage.

    c.   This pandemic should be covered unless there is a specific exclusion for
pandemics.

    d.   If insurers deny coverage, they would be acting in bad faith.

67.    These orders required the closure of certain facilities like dining rooms within restaurants, cafes, and bars. Many restaurants, bars, cafes, stores, hotels, and other businesses throughout the state were forced to close entirely.

68.    These Orders and proclamations, as they relate to the closure of all non-life-sustaining businesses, evidence an awareness on the part of both state and local governments that COVID-19 causes physical damage to property. This is particularly true in places where business is conducted, such as Plaintiff's, as the requisite contact and interaction causes a heightened risk of the property becoming contaminated.

69.    Plaintiff did not have the ability or right to ignore these civil authority Orders and proclamations as doing so would expose Plaintiff to fines and sanctions.

70.    Plaintiff's adherence to the requirements of these civil authority Orders and proclamations was in furtherance of protecting the public, the public good, public policy in favor of minimizing the risk of spread of COVID-19, and complying with the civil authority Orders.

**IV.   Impact on Plaintiff**

71.     Plaintiff's business loss occurred when the state and local government issued orders that forced Plaintiff's business to shut down.

72.     Prior to the issuance of the orders, Plaintiff's business was open.

73.     Plaintiff has submitted a claim to Defendant related to such losses, but Defendant denied Plaintiff's claims.

74.     In light of the Plaintiff's inability to safely use or operate its Insured Property due to the COVID-19 Pandemic, as well as state and local civil authority Orders requiring all non-life-sustaining businesses to cease operations and close all physical locations due to physical loss and damage caused by the COVID-19 Pandemic, Plaintiff was forced to suspend operations of its business.

75.     Access to Plaintiff's business was prohibited by civil authority Orders.

76.     The civil authority Orders entered by the state and local government were in the exercise of authority to protect the public and minimize the risk of spread of disease.

77.     Even with the entry of these civil authority Orders, there remained physical impact not only in and within Plaintiff's business property but in and around the surrounding location of Plaintiff's business property in light of COVID-19 presence not being detectable other than through microscopic means, and occurrence of illness.

78.     Plaintiff has suffered "direct physical loss of or damage" to its property due to the COVID-19 Pandemic. Among other things, COVID-19 made the Insured Property unusable in the way that it had been used before the Pandemic, rendered the property substantially unusable and uninhabitable, intruded upon the property, damaged the property, prevented physical access to and use of the property, and caused a suspension of business operations at the property.

79.     The COVID-19 Pandemic also caused physical loss and damage to property near Plaintiff's Insured Property.

80.     This loss is physical. Instead of being able to operate Plaintiff's business normally, the Insured Property was required to physically alter and drastically reduce operations, and even to close entirely. To do anything else would lead to the emergence or reemergence of COVID-19 at the location. Given the widespread prevalence of COVID-19, even limited use of the Insured Property was not reasonably safe for extended periods. The high probability of illness and contamination prevents the full physical use of the property.

81.     Plaintiff's Insured Property is not a closed environment, and because people—staff, customers, community members, and others—constantly cycle in and out, there is an ever-present risk that the Insured Property is contaminated and would continue to be contaminated.

82.     Businesses like Plaintiff's are more susceptible to being or becoming contaminated, as both respiratory droplets and fomites are more likely to be retained on the Insured Property and remain for far longer as compared to a facility with open-air ventilation.

83.     Plaintiff's Insured Property is also highly susceptible to rapid person-to-property transmission of the coronavirus, and vice-versa, because the service nature of the business places staff and customers in close proximity to the property and to one another and because the nature of the business exposes people to high levels of respiratory droplets and fomites being released into the air of the property.

84.     Because of the nature of COVID-19 as described above, relating to its persistence in locations and the prospect of causing asymptomatic responses in some people, the risk of infection to persons is not only high, but could cause persons with asymptomatic responses to then

16

come into contact with others who would not be so fortunate as to suffer merely an asymptomatic response, and instead suffer serious illness.

85.     The virus is physically impacting Plaintiff. Any effort by Defendant to deny the reality that the virus causes physical loss and damage would constitute a false and potentially fraudulent misrepresentation that could endanger Plaintiff and the public.

86.     Plaintiff specifically sought coverage for business interruption losses and extra expenses and paid premiums for such coverage with an expectation that the Policy provided such coverage, with no disclosures to the contrary being made to Plaintiff by Defendant or their agents.

87.     A declaratory judgment determining that the coverage provided under the Policy exists is necessary so as to prevent Plaintiff from being left without vital coverage acquired to ensure the survival of the business due to the shutdown caused by the civil authority Orders. As a result of these Orders, Plaintiff has incurred, and continues to incur, among other things, a substantial loss of business income and additional expenses covered under the Policy.

**V.     Impact on Class Members**

88.     The Civil Authority Orders issued by New York state and local authorities are similar to Civil Authority Orders that have been issued nationwide by state and local civil authorities during the course of the class period. *See* https://www.wsj.com/articles/a-state-by-state-guide-to-coronavirus-lockdowns-11584749351.

1.  *Alabama*

- **Travel outside home:** Only for essential needs/work.

- **Gatherings:** 10-person limit.

- **Businesses:** Nonessential businesses are closed to the public, including entertainment venues, fitness centers, salons, nail parlors and certain retailers.

- **Quarantines:** No statewide directive.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** Beaches closed.

2. *Alaska*

- **Travel outside home:** Only for essential needs/work.

- **Gatherings:** 10-person limit.

- **Businesses:** Nonessential businesses are limited to minimum operations or remote work.

- **Quarantines:** Travelers from out of state must self-quarantine for 14 days.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** Unless locally restricted, open with social distancing.

3. *Arizona*

- **Travel outside home:** Residents are advised to limit travel outside the home.

- **Gatherings:** Residents are advised to avoid gatherings.

- **Businesses:** Nonessential businesses can reopen with enhanced physical distancing and safety measures in place.

- **Quarantines:** No statewide directive.

- **Bars/restaurants:** Restaurants and bars can reopen with safety precautions.

- **Beaches/parks:** Unless locally restricted, open with social distancing.

4. *Arkansas*

- **Travel outside home:** The governor has not issued a stay-at-home order.

- **Gatherings:** 10-person limit; does not apply to unenclosed outdoor spaces or places of worship.

- **Businesses:** Gym and entertainment venues are closed. Hotels, motels and vacation rentals are restricted to authorized guests.

- **Quarantines:** No statewide directive.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** State parks remain operational during the daytime.

5. *California*

- **Travel outside home:** Only for essential needs/work.

- **Gatherings:** Gatherings in a single room or place are prohibited. Visitation to hospitals, nursing homes and other residential care facilities is restricted.

- **Businesses:** Nonessential businesses are closed.

- **Quarantines:** No statewide directive.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** Some parks are fully closed. Local jurisdictions have closed some beaches.

6. *Colorado*

- **Travel outside home:** Only for essential needs/work.

- **Gatherings:** Public and private gatherings of any number are prohibited with limited exceptions.

- **Businesses:** Nonessential businesses are limited to minimum operations or remote work.

- **Quarantines:** No statewide directive.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** State parks remain open, but playgrounds, picnic areas and campgrounds are closed.

7. *Connecticut*

- **Travel outside home:** Only for essential needs/work.

- **Gatherings:** Five-person limit for social and recreational gatherings; 50-person limit for religious services.

- **Businesses:** Nonessential businesses must suspend all in-person operations.

- **Quarantines:** No statewide directive. Out-of-state visitors are strongly urged to self-quarantine.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** Trails and grounds of state parks and forests are open with social distancing.

8. *Delaware*

- **Travel outside home:** Only for essential needs/work.

- **Gatherings:** 10-person limit.

- **Businesses:** Nonessential businesses are limited to minimum operations or remote work.

- **Quarantines:** Visitors from out of state who are not just passing through must self-quarantine for 14 days.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** Beaches are closed except for exercise or dog walking. State parks remain open with restricted activity.

9. *District of Columbia*

- **Travel outside home:** Only for essential needs/work.

- **Gatherings:** Large gatherings of more than 10 individuals not of the same household are prohibited.

- **Businesses:** Nonessential businesses remain closed.

- **Quarantines:** No citywide directive.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** All Department of Parks and Recreation facilities and outdoor spaces are closed.

10. *Florida*

- **Travel outside home:** Senior citizens and those with significant medical conditions may not leave home unless for essential needs or to go to an essential job.

- **Gatherings:** No social gatherings in a public space with religious exemptions.

- **Businesses:** Nonessential services are closed to the public. Gun stores remain open.

- **Quarantines:** Visitors from outbreak hot spots, such as the New York tri-state area, must self-quarantine for 14 days.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** Florida state parks are closed. Most beaches are closed.

*11. Georgia*

- **Travel outside home:** Mandated social distancing and recommended mask-wearing outside. Older and at-risk residents can leave only for essential needs/work with limited visitors.

- **Gatherings:** 10-person limit, not applying to incidental or transitory groups of people going by each other.

- **Businesses:** Nonessential businesses and other entities may not permit gatherings at their premises.

- **Quarantines:** No statewide directive.

- **Bars/restaurants:** Dine-in allowed with capacity limits, sanitation requirements and dozens of other precautionary measures.

- **Beaches/parks:** Open, with social distancing.

*12. Hawaii*

- **Travel outside home:** Only for essential needs/work.

- **Gatherings:** 10-person limit.

- **Businesses:** Nonessential businesses are limited to minimum operations or remote work. Essential services must implement separate operating hours for high-risk populations.

- **Quarantines:** Travelers from out of state must self-quarantine for 14 days.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** Most state parks and public beaches are closed. All camping and lodging at parks is suspended.

*13. Idaho*

- **Travel outside home:** Only for essential needs/work.

- **Gatherings:** Nonessential gatherings are prohibited. Visits to hospitals, nursing homes and residential-care facilities are restricted.

- **Businesses:** Nonessential businesses are limited to minimum operations or remote work. Drive-in theaters and churches are permitted.

- **Quarantines:** Persons entering the state of Idaho are required to self-quarantine for 14 days.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** No camping in state parks.

*14. Illinois*

- **Travel outside home:** Only for essential needs/work.

- **Gatherings:** 10-person limit.

- **Businesses:** Nonessential businesses are limited to minimum operations or remote work.

- **Quarantines:** No statewide directive.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** State parks, fish and wildlife areas, recreational areas and historic sites are closed.

*15. Indiana*

- **Travel outside home:** Only for essential needs/work.

- **Gatherings:** 10-person limit.

- **Businesses:** Nonessential businesses are limited to minimum operations or remote work.

- **Quarantines:** No statewide directive.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** Hiking, biking, fishing, boating, birding, hunting and camping are allowed with social distancing.

*16. Iowa*

- **Travel outside home:** The governor has not issued a stay-at-home order.

- **Gatherings:** Limited to 10 people.

- **Businesses:** Nonessential retail businesses are closed.

- **Quarantines:** No statewide directive.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** Parks remain open. Campgrounds are closed.

*17. Kansas*

- **Travel outside home:** Only for essential needs/work.

- **Gatherings:** 10-person limit, exempting funerals and religious services with social distancing.

- **Businesses:** Residents may not leave home to patronize nonessential businesses, such as hair salons.

- **Quarantines:** Kansas residents who traveled to California, Florida, New York or Washington state after March 14—or visited Illinois or New Jersey after March 22—must self-quarantine for 14 days. The same applies to anybody who had close contact with a Covid-19 patient.

- **Bars/restaurants:** Dine-out or curbside service only.

- **Beaches/parks:** Most parks are open.

*18. Kentucky*

- **Travel outside home:** Travel outside the state is restricted to essential needs/work.

- **Gatherings:** Mass gatherings prohibited; smaller gatherings are allowed with social distancing.

- **Businesses:** Nonessential retail must close.

- **Quarantines:** Anybody coming in from out of state—including residents—must self-quarantine for 14 days upon return.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** State parks closed for overnight stays.

*19. Louisiana*

- **Travel outside home:** Only for essential needs/work.

- **Gatherings:** 10-person limit.

- **Businesses:** Nonessential businesses are limited to minimum operations or remote work.

- **Quarantines:** No statewide directive.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** Some state parks are open for fishing, hiking and biking during the day.

*20. Maine*

- **Travel outside home:** Only for essential needs/work. No use of public transportation unless absolutely necessary. .

- **Gatherings:** 10-person limit.

- **Businesses:** Nonessential businesses are limited to minimum operations or remote work.

- **Quarantines:** Travelers arriving in Maine, regardless of their state of residency, must self-quarantine for 14 days.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** Numerous parks and beaches closed.

*21. Maryland*

- **Travel outside home:** Only for essential needs/work.

- **Gatherings:** 10-person limit.

- **Businesses:** Nonessential businesses are limited to minimum operations or remote work. Senior-citizen activities centers are closed.

- **Quarantines:** People traveling into Maryland from anywhere outside Maryland are required to self-quarantine for 14 days with limited exceptions. (Guidance)

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** State park beaches are closed. Some parks remain open.

*22. Massachusetts*

- **Travel outside home:** People and especially older adults are strongly advised to stay home as much as possible. (Advisory)

- **Gatherings:** 10-person limit. Applies to confined spaces, not parks and other outdoor spaces.

- **Businesses:** Nonessential businesses must close their physical workplaces and facilities to workers and customers. Groceries must reserve an hour in the morning for older customers.

- **Quarantines:** Arriving travelers from out of state are instructed to self-quarantine for 14 days.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** No congregating on coastal beaches. State parks are open and campgrounds closed.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** State parks are open, but campgrounds, overnight lodging facilities and shelters are closed.

*23. Michigan*

- **Travel outside home:** Only for essential needs/work.

- **Gatherings:** Public and private gatherings are prohibited, with religious and other limited exceptions.

- **Businesses:** Nonessential businesses are limited to minimum operations or remote work. Manufacturing workers can resume work.

- **Quarantines:** No statewide directive.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** State parks are open, but campgrounds, overnight lodging facilities and shelters are closed.

*24. Minnesota*

- **Travel outside home:** Only for essential needs/work.

- **Gatherings:** No statewide directive.

- **Businesses:** Entertainment and performance venues are closed.

- **Quarantines:** No statewide directive.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** Wildlife management areas, state forests and state parks remain open. Campgrounds are closed.

25. *Mississippi*

- **Travel outside home:** Only for essential needs/work.

- **Gatherings:** 10-person limit.

- **Businesses:** Nonessential businesses are limited to minimum operations or remote work.

- **Quarantines:** No statewide directive.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** State parks are open for fishing. Beaches can re-open with social distancing.

26. *Missouri*

- **Travel outside home:**

- **Gatherings:** 10-person limit.

- **Businesses:** Nonessential businesses must enforce social distancing. Essential retailers must limit occupancy.

- **Quarantines:** No statewide directive.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** State parks and trails are open during the day.

27. *Montana*

- **Travel outside home:** Only for essential needs/work.

- **Gatherings:** Nonessential social and recreational gatherings are prohibited, if social distancing ca not be maintained.

- **Businesses:** Nonessential businesses are limited to minimum operations or remote work.

- **Quarantines:** Nonwork travelers from out of state must self-quarantine for 14 days.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** Open with social distancing.

*28. Nebraska*

- **Travel outside home:** The governor has not issued a stay-at-home order.

- **Gatherings:** 10-person limit.

- **Businesses:** No statewide directive.

- **Quarantines:** No statewide travel quarantine. Mandatory quarantines required for Covid-19 patients and households.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** No overnight camping at state parks, state recreation areas and wildlife management areas.

*29. Nevada*

- **Travel outside home:** Only for essential needs/work.

- **Gatherings:** People may not congregate in groups of 10 or more.

- **Businesses:** Recreational, entertainment and personal-care businesses are closed, including casinos.

- **Quarantines:** No statewide directive.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** State parks in the greater Las Vegas area, including Valley of Fire and Rye Patch are closed. Other state parks remain open for day-use only.

*30. New Hampshire*

- **Travel outside home:** Only for essential needs/work.

- **Gatherings:** Nine-person limit.

27

- **Businesses:** Nonessential businesses are limited to minimum operations or remote work.

- **Quarantines:** No statewide directive.

- **Bars/restaurants:** Dine-out only

- **Beaches/parks:** Most park sites are open.

*31. New Jersey*

- **Travel outside home:** Only for essential needs/work.

- **Gatherings:** 10-person limit.

- **Businesses:** Nonessential retail businesses must close bricks-and-mortar premises. Recreational and entertainment businesses are closed to the public.

- **Quarantines:** No statewide directive.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** Some local beach closures. All state parks and forests are closed to the public.

*32. New Mexico*

- **Travel outside home:** Only for essential needs/work.

- **Gatherings:** Five-person limit in a single room or connected space outside residence.

- **Businesses:** Nonessential businesses must suspend all in-person operations.

- **Quarantines:** Arriving air travelers must self-quarantine for two weeks.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** State parks are closed.

*33. New York*

- **Travel outside home:** Only for essential needs/work. Individuals age 70 and older and those with compromised immune systems must stay home and limit home-visitation to immediate family members or close friends.

- **Gatherings:** Nonessential gatherings are prohibited.

- **Businesses:** Nonessential businesses limited to minimum operations or remote work. (Guidance)

- **Quarantines:** No mandatory quarantine for out-of-state travelers. Mandatory quarantines for people who have been in close contact with a Covid-19 patient.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** Social distancing at state parks.

*34. North Carolina*

- **Travel outside home:** Only for essential needs/work.

- **Gatherings:** 10-person limit.

- **Businesses:** Nonessential businesses are limited to minimum operations or remote work.

- **Quarantines:** No statewide directive.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** People may go to public parks and outdoor recreation areas unless locally restricted.

*35. North Dakota*

- **Travel outside home:** The governor has not issued a stay-at-home order.

- **Gatherings:** No statewide directive.

- **Businesses:** Personal-care services and recreational facilities are closed.

- **Quarantines:** Mandatory quarantine for residents returning from abroad or domestic travelers returning from a state with widespread community infection.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** State parks are open for day-use only.

*36. Ohio*

- **Travel outside home:** Only for essential needs/work.

- **Gatherings:** 10-person limit.

- **Businesses:** Nonessential businesses and operations must cease all activities except minimum basic operations.

- **Quarantines:** Travelers arriving in Ohio should self-quarantine for 14 days with limited exceptions.

- **Bars/restaurants:** Dine-out only.

- Beaches/parks: Wildlife areas, forests and nature preserves remain open.

*37. Oklahoma*

- **Travel outside home:** Vulnerable individuals (older residents and those with underlying medical problems) are directed to stay home except when running essential errands or commuting to critical infrastructure jobs.

- **Gatherings:** 10-person limit. No visitors at nursing homes, retirement or long-term care facilities.

- **Businesses:** Nonessential businesses must suspend services.

- **Quarantines:** Arriving travelers from the New York tri-state area, California, Louisiana and Washington should self-quarantine for 14 days with limited exceptions.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** Hiking trails, picnic tables, fishing areas and boat ramps are available for outdoor recreation.

*38. Oregon*

- **Travel outside home:** Only for essential needs/work.

- **Gatherings:** Gatherings over 25 people are canceled statewide. Oregonians are urged to avoid gatherings of 10 people.

- **Businesses:** Nonessential business closures.

- **Quarantines:** No statewide directive.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** No daytime or overnight visitors are permitted at any state park.

*39. Pennsylvania*

- **Travel outside home:** Only for essential needs/work in most counties. Order has expired in many rural counties.

- **Gatherings:** Gatherings are generally prohibited. Larger gatherings of up to 25 people are allowed in rural areas.

- **Businesses:** In most counties, non-life-sustaining businesses must close or operate remotely. In rural areas, some non-life-sustaining businesses can reopen with restrictions and safety measures. Indoor recreation businesses, personal-care services, entertainment venues, restaurants and bars remain closed. Restrictions have been relaxed for businesses and employees in the real-estate industry.

- **Quarantines:** No statewide directive.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** Trails, lakes, roads and parking are limited to "passive and dispersed recreation." Marinas are open and campgrounds are closed.

*40. Rhode Island*

- **Travel outside home:** Only for essential needs/work.

- **Gatherings:** Five-person limit.

- **Businesses:** Noncritical retail businesses must cease operations.

- **Quarantines:** Mandatory two-week quarantine for out-of-state visitors.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** State beaches and parks are closed.

*41. South Carolina*

- **Travel outside home:** Only for essential needs/work.

- **Gatherings:** Gatherings of three or more are prohibited if deemed a threat to public health.

- **Businesses:** Nonessential businesses are limited to minimum operations or remote work.

- **Quarantines:** No statewide directive.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** Public beaches and access points to lakes, rivers and waterways are closed. Local restrictions on parks.

*42. South Dakota*

- **Travel outside home:** The governor has not issued a stay-at-home order.

- **Gatherings:** Unnecessary gatherings of 10 or more prohibited.

- **Businesses:** No statewide directive.

- **Quarantines:** No statewide directive.

- **Bars/restaurants:** No statewide directive.

- **Beaches/parks:** No statewide directive.

*43. Tennessee*

- **Travel outside home:** Only for essential needs/work.

- **Gatherings:** Social gatherings of 10 or more people prohibited.

- **Businesses:** Nonessential businesses are limited to minimum operations or remote work.

- **Quarantines:** No statewide directive.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** Most state parks have reopened for day-use only.

*44. Texas*

- **Travel outside home:** Texans must minimize in-person contact with people who are not in the same household. (A number of major counties have more explicit stay-at-home orders.) No visits to nursing homes or long-term care facilities unless providing critical assistance.

- **Gatherings:** 10-person limit.

- **Businesses:** No eating or drinking at bars and restaurants or visits to gyms, massage establishments, tattoo studios, piercing studios and cosmetology salons.

- **Quarantines:** Air travelers flying to Texas from New York, New Jersey, Connecticut, California, Louisiana or Washington—or Atlanta, Chicago, Detroit, Miami—must self-quarantine for 14 days.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** Many state parks remain open. Some beaches are closed or limited to restricted activities.

45. *Utah*

- **Travel outside home:** High-risk individuals (older residents and those with serious underlying medical conditions) may leave only for essential needs/work. Others must stay home whenever possible.

- **Gatherings:** 10-person limit recommended.

- **Businesses:** Businesses must minimize face-to-face contact with high-risk employees.

- **Quarantines:** Two-week quarantine after traveling out of state or exposed to a person with Covid-19 symptoms.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** State parks open to all visitors, except parks under local health order restrictions.

46. *Vermont*

- **Travel outside home:** Only for essential needs/work.

- **Gatherings:** Nonessential gatherings are limited to 10 people.

- **Businesses:** Nonessential businesses are limited to minimum operations or remote work.

- **Quarantines:** Visitors must self-quarantine for two weeks unless traveling for an essential purpose.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** RV parks and campgrounds are closed with emergency shelter exceptions

47. *Virginia*

- **Travel outside home:** Only for essential needs/work.

- **Gatherings:** 10-person limit.

- **Businesses:** Recreation and entertainment businesses must close.

- **Quarantines:** No statewide directive.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** Beaches are closed except for fishing and exercising. State parks are open for day-use activities. Campgrounds are closed.

*48. Washington*

- **Travel outside home:** Only for essential needs/work.

- **Gatherings:** All gatherings of people for social, spiritual and recreational purposes are prohibited.

- **Businesses:** Nonessential businesses are limited to minimum operations or remote work.

- **Quarantines:** No statewide directive.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** State parks and recreational fisheries are closed.

*49. West Virginia*

- **Travel outside home:** Only for essential needs/work.

- **Gatherings:** Five-person limit with some exceptions.

- **Businesses:** Nonessential businesses are limited to minimum operations or remote work.

- **Quarantines:** Two-week mandatory quarantines for people traveling into West Virginia from areas of substantial community spread of Covid-19.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** Park lodges, cabins and campgrounds are closed.

*50. Wisconsin*

- **Travel outside home:** Only for essential needs/work.

- **Gatherings:** All public and private gatherings are prohibited with limited exceptions.

- **Businesses:** Nonessential businesses are limited to minimum operations or remote work.

- **Quarantines:** No mandatory quarantine for out-of-state travelers. Self-quarantine recommended for out-of-state travelers.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** Many state parks are closed. Campgrounds are closed.

51. *Wyoming*

- **Travel outside home:** Residents urged but not required to stay home whenever possible.

- **Gatherings:** Limited to nine people.

- **Businesses:** Theaters, bars, museums, gyms, nightclubs and other public places are closed.

- **Quarantines:** People traveling to Wyoming for nonwork purposes must self-quarantine for 14 days.

- **Bars/restaurants:** Dine-out only.

- **Beaches/parks:** No statewide directive.

89.     Such Civil Authority Orders had substantially the same effect on Plaintiff and Class members, preventing the safe and lawful operation of their businesses.

## CLASS ALLEGATIONS

**VI.   Insurance Coverage**

90.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(b)(2) on behalf of the following Class:

> All insureds of Defendant who have suffered business interruption and lost income as a result of the COVID-19 pandemic and the issuance of Civil Authority Orders issued in response to the COVID-19 pandemic.

91.     Upon information and belief, Defendant has refused to cover business interruption services for all insureds in contravention to the uniform language contained in the insurance policies it has issued.

92.     The exact number of the Class members is unknown as such information is in exclusive control of Defendant. However, due to the nature and commerce involved, Plaintiff believes the Class consists of hundreds of insureds nationwide, making joinder of the Class members impractical.

93.     Common questions of law and fact affect the right of each Class member. Plaintiff is seeking Declaratory Relief for all Class members who operate businesses with similar polices to Plaintiff's Policy. Declaratory relief will permit adjudication of the rights of all parties as to whether Defendant's policies provide coverage for business interruptions losses the Class has suffered as a result of Civil Authority Orders.

94.     Common questions of law and fact that affect the Class members include, but are not limited to:

      a.   Whether Defendant was legally obligated to pay for business interruption as a result of Civil Authority Orders issued in response to the COVID-19 pandemic;

      b.   Whether Plaintiff and Class members have suffered direct physical loss of use of property or property damage in accordance with the terms and conditions of Defendant's business interruption insurance policies;

      c.   Whether Plaintiff and Class members are excluded from coverage for losses they suffered due to the Civil Authority Orders; and

      d.   Whether Defendant is justified in denying Plaintiff and Class members' claims.

95.     The claims and defenses of Plaintiff, as representative plaintiff, are typical of the claims and defenses of the Class because Defendant wrongfully denied that its policies cover claims of Plaintiff and the Class members.

96.     Plaintiff, as representative plaintiff, will fairly and adequately assert and protect the interests of the Class.

    a.   Plaintiff has hired attorneys who are experienced in prosecuting class actions and will adequately represent the interests of the Class.

    b.   Plaintiff has no conflict of interest that will interfere with the maintenance of a class action.

97.     A class action provides a fair and efficient method for adjudication of the controversy.

    a.   Prosecution of separate actions by individual Class members would create a risk of inconsistent and varying results against Defendant when confronted with incompatible standards of conduct; and

    b.   Adjudications with respect to individual Class members could, as a practical matter, be dispositive of any interest of other members not parties to such adjudications and substantially impair their ability to protect their interests.

98.     Defendant has taken steps to discourage the Class from submitting claims under their policies. For this reason, Declaratory relief for the entire class is appropriate and necessary.

## CAUSE OF ACTION

## DECLARATORY RELIEF

99.     Plaintiff re-alleges and incorporates by reference into this cause of action each and every allegation set forth in each and every paragraph of this Complaint.

100.    The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that in "a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

101.    An actual controversy has arisen between Plaintiff and Defendant as to the rights, duties, responsibilities and obligations of the parties in that Plaintiff contends and, on information and belief, Defendant disputes and denies that:

a. Plaintiff's and Plaintiff's Dependent Properties have experienced direct physical loss of use or property or physical property damage;

b. The Civil Authority Orders constitute a prohibition of access to Plaintiff's Insured Property;

c. The prohibition of access by the Civil Authority Orders has specifically prohibited access as defined in the Policy;

d. Plaintiff had no choice but to comply with the Civil Authority Orders and suspend operations at the business;

e. The Civil Authority Orders trigger coverage;

f. The Policy provides coverage to Plaintiff for any current and future civil authority closures of a non-essential businesses due to physical loss of use of property or physical damage from the coronavirus under the Civil Authority coverage parameters; and

g. The Policy provides business income coverage in the event that the coronavirus has caused a loss or damage at the Insured Property or immediate area of the Insured Property.

102. Resolution of the duties, responsibilities and obligations of the parties is necessary as no adequate remedy at law exists, and a declaration of the Court is needed to resolve the dispute and controversy.

103. Plaintiff seeks a Declaratory Judgment that property in the area of the Insured Property has experienced direct physical loss of use of property or physical property damage.

104. Plaintiff seeks a Declaratory Judgment that the Civil Authority Orders constitute a prohibition of access to Plaintiff's Insured Property.

105. Plaintiff seeks a Declaratory Judgment that the prohibition of access by the Civil Authority Orders has specifically prohibited access as defined in the Policy.

106. Plaintiff seeks a Declaratory Judgment that Plaintiff had no choice but to comply with the Civil Authority Orders and suspend operations at the business.

107.    Plaintiff seeks a Declaratory Judgment that the Civil Authority Orders trigger coverage.

108.    Plaintiff seeks a Declaratory Judgment that the Policy provides coverage to Plaintiff for any current and future civil authority closures of a non-essential businesses due to physical loss of use of property or physical property damage from the coronavirus under the Civil Authority coverage parameters.

109.    Plaintiff seeks a Declaratory Judgment that the Policy provides business income coverage in the event that the coronavirus has caused a loss or damage at the Insured Property or immediate area of the Insured Property.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff herein prays as follows:

a.    For a declaration that property in the area of the Insured Property has experienced direct physical loss or damage.

b.    For a declaration that the Orders constitute a prohibition of access to Plaintiff's Insured Property.

c.    For a declaration that the prohibition of access by the Orders has specifically prohibited access as defined in the Policy.

d.    For a declaration that Plaintiff had no choice but to comply with the civil authority Orders and suspend operations at the business;

e.    For a declaration that the Orders trigger coverage.

f.    For a declaration that the Policy provides coverage to Plaintiff for any current and future civil authority closures of a non-essential businesses due to physical loss or damage from the coronavirus under the Civil Authority coverage parameters.

g.    For a declaration that the Policy provides business income coverage in the event that the coronavirus has caused a loss or damage at the Insured Property or immediate area of the Insured Property.

h.    For such other relief as the Court may deem proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands trial by jury.


Dated: April 23, 2021                                   Respectfully submitted,

                                                        */s/ Daniel C. Levin*

                                                        Arnold Levin, Esq.
                                                        Laurence S. Berman, Esq.
                                                        Frederick Longer, Esq.
                                                        Daniel Levin, Esq.
                                                        **LEVIN SEDRAN & BERMAN LLP**
                                                        510 Walnut Street, Suite 500
                                                        Philadelphia, PA 19106
                                                        Telephone (215)592-1500
                                                        Facsimile (215) 592-4663

                                                        Richard M. Golomb, Esq.
                                                        Kenneth J. Grunfeld, Esq.
                                                        **GOLOMB & HONIK, P.C.**
                                                        1835 Market Street, Suite 2900
                                                        Philadelphia, PA 19103
                                                        Telephone: (215) 346-7338
                                                        Facsimile: (215) 985-4169

                                                        Mark P. Chalos
                                                        **LIEFF CABRASER HEIMANN &**
                                                        **BERNSTEIN, LLP**
                                                        222 2nd Avenue South, Suite 1640
                                                        Nashville, TN 37201-2379
                                                        Telephone: 615.313.9000
                                                        Facsimile: 615.313.9965

                                                        Robert J. Nelson
                                                        Fabrice N. Vincent
                                                        Jacob H. Polin
                                                        **LIEFF CABRASER HEIMANN &**
                                                        **BERNSTEIN, LLP**
                                                        275 Battery Street, 29th Floor
                                                        San Francisco, CA 94111-3339
                                                        Telephone: 415.956.1000
                                                        Facsimile: 415.956.1008

40

Gabriel A. Panek
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013-1436
Tel.: 212.355.9500
Fax: 212.355.9592

Alexandra L. Foote
**LAW OFFICE OF ALEXANDRA L.
FOOTE, P.C.**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 786.408.8083
Facsimile: 415.956.0561

*Attorneys for Plaintiff*